UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

GLADYS MILLER,                                    :

                                Plaintiff,        :        **REPORT AND**
                                                           **RECOMMENDATION**
                                                           **TO THE HONORABLE**
                -against-                         :        **LORETTA A. PRESKA**

MICHAEL J. ASTRUE,[1]                             :        03 Civ. 2072 (LAP)(FM)
Commissioner of Social Security,
                                                  :
                                Defendant.
--------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

                Plaintiff Gladys Miller ("Miller") brings this action pursuant to Section

205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to seek review

of a final decision of the Commissioner of Social Security ("Commissioner") granting her

application for disability insurance and Supplemental Security Income ("SSI") benefits as

of August 29, 2001.  The Commissioner has now moved, pursuant to Fed. R. Civ. P.

12(c), for judgment on the pleadings remanding the case for further administrative

proceedings.  Miller has cross-moved for judgment on the pleadings reversing the

---

[1]      Michael J. Astrue, the current Commissioner of Social Security, has been
substituted as the defendant in this action pursuant to Fed. R. Civ. P. 25(d).

decision of the Administrative Law Judge ("ALJ") and remanding the case solely for the calculation of benefits.[2]

For the reasons that follow, I recommend that the Commissioner's motion be granted, and that the plaintiff's cross-motion be denied.

## II.  Background

### A.  Procedural History

On January 11, 2001, Miller filed applications for disability insurance and SSI benefits in which she alleged that she became disabled on May 15, 1999.  (R. 64-66, 205-07).[3]  After the Social Security Administration ("SSA") denied both applications, Miller requested a de novo hearing before an ALJ, which was held on August 19, 2002. (Id. at 17-36, 43).  Following that hearing, the ALJ issued a written decision on September 26, 2002, in which he concluded that Miller was ineligible for benefits.  (Id. at 11-16).  The ALJ's decision became the Commissioner's final decision after the Appeals Council denied further review on January 30, 2003.  (Id. at 4-5).  Thereafter, on March

---

[2]      Miller has not specifically asked the Court to remand the case for the calculation of benefits.  Rather, she requests only that the decision "be reversed and the plaintiff . . . awarded judgment on the pleadings, with retroactive benefits paid from May 15, 1999."  (Pl.'s Mem. at 16).  However, even if the Court were to reverse and award retroactive benefits, it would still need to remand the case solely for the calculation of those benefits.  See, e.g., Arroya v. Callahan, 973 F. Supp. 397, 401 (S.D.N.Y. 1997) (remanding for sole purpose of allowing SSA to calculate benefits after district court established an earlier disability onset date).  I therefore have treated Miller's cross-motion as one seeking reversal and a remand solely for the calculation of benefits.

[3]      Citations to "R. ___" refer to the administrative record filed by the Commissioner as part of its motion.

25, 2003, Miller, proceeding pro se, sought review of that decision by this Court. (Id. at

228). On October 20, 2004, Judge Mukasey remanded the case for further administrative

proceedings pursuant to the sixth sentence of 42 U.S.C. § 405(g). Miller v. Barnhart, No.

03 Civ. 2072 (MBM), 2004 WL 2434972, at *6 (S.D.N.Y. Oct. 20, 2004) (concluding

that the ALJ failed "to develop the record adequately, primarily because he misapplied the

Circuit's firmly established treating physician rule").[4]

On March 20, 2003, before Judge Mukasey ruled, Miller filed a new

application for disability insurance and SSI benefits. On July 1, 2003, the SSA

determined that she was "disabled" as of March 1, 2003, and on April 23, 2005, the

Appeals Council denied a request to review this decision. (See R. 217). Therefore, on

remand when the ALJ held a hearing on February 16, 2006 ("remand hearing"), he

considered only whether Miller was entitled to retroactive benefits for any portion of the

period between May 15, 1999, and February 28, 2003. (Id. at 435). In his decision dated

May 25, 2006, the ALJ concluded that Miller was eligible for SSI benefits as of August

29, 2001, but not prior to that date.[5] (Id. at 217-24).

---

[4]     Miller is now represented, and was represented in the hearing before the ALJ on
remand, by Cardozo Bet Tzedek Legal Services, a clinical program at Benjamin N. Cardozo
School of Law.

[5]     The ALJ also determined that for purposes of Miller's application for disability
insurance benefits, she was "not disabled" through June 30, 2000, which was "the date last
insured." (R. 223). Neither party has challenged this determination.

On or about February 2, 2007, the Commissioner filed his motion seeking a remand for further administrative proceedings. (Docket No. 21). On or about March 30, 2007, Miller cross-moved for reversal of the ALJ's decision to the extent the ALJ found that she was not disabled prior to August 29, 2001. On November 6, 2007, Your Honor referred the case to me for a Report and Recommendation. (Docket No. 29).

B.    Relevant Facts

1.    Miller's Testimony

Miller was born on July 16, 1954. (R. 26). She has an associate's degree in paralegal studies and is thirty-eight credits shy of a bachelor's degree. (Id. at 456). She also has certificates in stenography, typing, computers, and business writing. (Id.). She has been employed as a switchboard operator, secretary, typist, security guard, and telephone operator, among other jobs. (Id. at 456, 463-64). On May 15, 1999, Miller stopped working because of "pain radiating" through both of her legs and in her hips.[6] (Id. at 64, 459).

---

[6]    At the remand hearing, Miller seemed confused when questioned about her work activity. She testified that she was "not sure" if she worked after May 15, 1999, given the passage of time. (See R. 465). Affording Miller the "benefit of the doubt," the ALJ subsequently found that she had "not engaged in substantial gainful activity at any time" relevant to his decision. (Id. at 220).

2.    Medical Evidence

a.    New York University's Hospital for Joint Diseases

Miller first sought treatment for knee and back pain in 1996 at the New

York University Medical Center Hospital for Joint Diseases ("HJD").  (Id. at 114).  She

visited HJD at least five times that year, complaining of a three-year history of bilateral

knee and lower back pain.  (Id. at 102-22).  She also complained of pain in her hips and

stated that she had walked with a limp for three years.  (Id. at 105, 110).  During her visits

to HJD, Miller had two sets of x-rays and one MRI scan.  The MRI led to a finding of

"mild bilateral osteoarthritis of both hips," while the x-rays suggested that the

osteoarthritis of both hips was advanced.[7]  (Id. at 120-21).  One doctor also noted that her

right leg was one-half inch shorter than her left leg.  (Id. at 109-10).  Miller ultimately

was diagnosed with early osteoarthritis of her hips and was instructed to consider bilateral

hip replacement surgery if her condition worsened.  (Id. at 103).

b.    1996 to 2001

After her final visit to HJD on November 27, 1996, Miller apparently did

not seek medical treatment again until February 24, 2001.  (See id. at 124).  She alleges

that she failed to seek any medical treatment during this approximately four-year period

because she lacked health insurance, was unable to pay for care, and also previously had a

---

[7]    Osteoarthritis is a "noninflammatory degenerative joint disease . . . characterized
by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the
synovial membrane."  Dorland's Illustrated Medical Dictionary 1197 (27th ed. 1988).  "It is
accompanied by pain and stiffness, particularly after prolonged activity."  Id.

negative experience with tubal ligation surgery.  (Id. at 446-47, 471-72; Pl.'s Mem. at 4).

However, when the ALJ pressed for information about her insurance coverage between

1999 and 2001, Miller stated that her Medicaid coverage was "off and on."  (R. 446-47).

To cope with her pain while she was not being treated, Miller obtained prescription pain

killers from a friend.  (Id. at 450).

        c.     Dr. Antoine

On February 24, 2001, Miller was evaluated by Dr. Roger Antoine ("Dr.

Antoine"), a consulting physician to the SSA.  (Id. at 124-25).  Miller told Dr. Antoine

that for "five years she ha[d] been suffering from severe low back pain radiating to both

lower extremities" and right "hip pain and stiffness."  (Id.).  She also stated that she could

"sit up to one hour," "stand up to 15 minutes," "walk up to two blocks without stopping,"

and "lift up to 10 to 15" pounds.  (Id.).  After conducting a physical exam, Dr. Antoine

described her prognosis as "guarded," explaining that she would "have difficulty

[performing] daily activities requiring standing for a long period of time, walking long

distances, climbing and descending stairs, squatting, and heaving lifting."  (Id. at 125).

Dr. Antoine's impression was that Miller had probable "osteoarthritis of the lumbosacral

spine," "[b]ilateral lumbar radiculopathy,"[8] and probable "avascular necrosis of the

hips."[9]  (Id.).  He noted that Miller was walking with "limitation of motion at the right

_____

     [8]     Radiculopathy is "a disease of the nerve roots."  Dorland's, supra, at 1405.

     [9]     Avascular necrosis is "the sum of the morphological changes indicative of cell
                                                  (continued...)

hip," but still had a full range of motion in her spine, elbows, and wrists. (Id. at 124). X-rays that Dr. Antoine evidently had ordered subsequently revealed severe degenerative changes in Miller's right hip joint. (Id. at 127).

Based on Dr. Antoine's findings and the x-rays, the SSA concluded that Miller was capable of occasionally lifting ten pounds, frequently lifting less than ten pounds, standing or walking for at least two hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. (Id. at 129).

### d. Emergency Room Visit

On August 17, 2001, Miller sought treatment for her hip in the emergency room of Jacobi Medical Center ("Jacobi"). (Id. at 162). During that visit, she reported "on and off" hip pain for the previous three weeks and stated that her pain began in 1995. (Id.). X-rays taken during that visit and on August 29, 2001, revealed a "[d]egenerative joint disease of the bilateral hips." (Id. at 185). Before Miller was released, doctors referred her to the orthopedic and medicine clinics at Jacobi. (Id. at 162).

### e. Dr. Nevins

On August 29, 2001, Miller visited Dr. Russell Nevins at the Jacobi orthopedic clinic. (Id. at 141, 148). Dr. Nevins diagnosed Miller with severe degenerative bilateral hip disease and concluded that the "patient at this time needs full disability. Total, until receives bilateral hip replacements." (Id. at 141 (emphasis in

_____

[9](...continued)
death . . . due to deficient blood supply." Dorland's, supra, at 1101.

original)).  Dr. Nevins also found that Miller was experiencing pain and having difficulty ambulating, was able to lift and carry very little, could only walk a maximum of two blocks, had an impaired ability to sit, could climb and balance minimal amounts, and was unable to crouch, kneel, or crawl.  (Id. at 428).  He directed Miller to visit the rheumatology clinic for further evaluation and to return to the orthopedic clinic in two weeks.  (Id. at 165).

    f.  Further Jacobi Visits

    Miller received treatment at Jacobi at least eleven times between August 2001 and March 2002.  (See id. at 163, 167, 169-70, 174-81, 184).  These visits primarily related to Miller's complaints of continued pain in her hips.  On September 4, 2001, Miller complained to another physician of "on and off" pain in her hip since 1995 that had worsened over the previous three months.  (Id. at 163).  In an unsigned report, that physician found that Miller had a limited range of motion in her right hip with chronic degenerative changes; he also noted that she was taking Vioxx for her pain.  (Id.).  On September 20, 2001, Miller reported to Dr. Lori Ciuffo that she had been experiencing hip pain for three months and had to "pull herself out of bed."  (Id. at 167-68).  Dr. Ciuffo noted that Miller was walking with a limp, was extremely stiff, and had limited range of motion in both hips.  She concluded that Miller had severe osteoarthritis and suggested bilateral hip replacement surgery.  (Id. at 168).

The notes relating to Miller's subsequent visits to Jacobi, for both medical attention and physical therapy, indicate that Miller's condition remained the same. Miller continued to report persistent hip pain which was aggravated by walking, sitting, and standing. (Id. at 175, 179-80). An x-ray performed on March 19, 2002, confirmed moderate to severe degenerative changes in both hips. (Id. at 156). The Jacobi medical staff also recommended that Miller get a heel lift to equalize the length of her legs. (Id. at 183).

g.    Dr. Taverni

On or after August 29, 2001, Dr. Joseph Taverni of Jacobi prepared an undated Physician's Employability Report regarding Miller for the New York City Human Resources Administration. (Id. at 200). It is unclear whether Dr. Taverni examined Miller or simply reviewed her medical records. In any event, he diagnosed Miller as having bilateral hip osteoarthritis. Dr. Taverni stated, however, that Miller could still perform "desk duty" or work involving "telephones." He noted that Miller should not stand at work for more than ten minutes. (Id.).

h.    Hospital for Special Surgery

On May 29, 2002, Miller sought a second opinion about the need for hip replacement surgery at the hip clinic of the Hospital for Special Surgery ("HSS"). (Id. at 289). She reported pain in both hips, especially when she walked. (Id. at 325). Dr. M. Hansen noted that she was "somewhat disheveled" and had "somewhat disorganized"

9

speech, making it difficult to get a complete medical history. When the doctor examined her, she "grimace[d] with [the] internal rotation of [her] bilateral hips." (Id.). A radiograph revealed that she had "significant osteophytes in both hips."[10] (Id. at 327). Dr. Hansen concluded that "total hip replacements would have a good chance of relieving her pain," but that surgery was not absolutely necessary, an opinion Miller was "very relieved to hear." (Id.). Dr. Hansen prescribed Bextra and referred her to a rheumatology clinic. (Id.).

Miller continued to visit HSS through at least March 2005. During one appointment on September 29, 2003, Dr. Arik Zaider, a physician who had followed Miller's progress for more than one year, concluded that Miller had "<u>severe</u> bilateral hip osteoarthritis." (Id. at 411 (emphasis in original)). Dr. Zaider noted that x-rays revealed "bilateral subchondral sclerosis and osteophyte formation of her hips," and that she had "difficulty with mobility and activities of daily living secondary to this condition."[11] (Id.).

On August 23, 2005, Dr. Mariya Tsinis, a consulting physician for the SSA, examined Miller. Dr. Tsinis noted that Miller complained of "constant pain in . . . both hips for more than ten years duration." (Id. at 361). She diagnosed Miller with osteoarthritis of both hip joints and decreased range of motion. With respect to work, she concluded that Miller's "abilities in lifting, carrying, pushing, pulling, prolonged standing

---

[10]      An osteophyte is a "bony excrescence or osseous outgrowth." <u>Dorland's</u>, <u>supra</u>, at 1200.

[11]      Sclerosis refers to a hardening of a body part. <u>Id.</u> at 1496.

and ambulation [were] moderately to severely impaired." (Id. at 363).  She also stated

that Miller's prognosis was "guarded to poor." (Id.).

       i.      Dr. Niewold

On April 10, 2006, Dr. Timothy Niewold of HSS submitted a statement to

the SSA indicating that he had been Miller's treating physician for the previous eighteen

months, during which time he saw her every four to six months.  (Id. at 427).  His last

examination of her was on January 9, 2006.  Based on that exam and his review of charts

of her past treatment, Dr. Niewold diagnosed Miller with severe osteoarthritis in both

hips, defining this as a degenerative joint disease characterized by the breakdown of

cartilage in the joints.  He noted that because of this condition, Miller had an impaired

gait and limited mobility in both hips, which affected her ability to walk and stand.  He

explained that Miller required a cane to walk more than one block and had reported

having difficulty walking more than three or four blocks even with a cane; she also

reported being unable to stand for more than thirty to sixty minutes during the day.  (Id.).

With respect to the date she became disabled, Dr. Niewold opined as

follows:

> Based on my ongoing assessment of [Miller], and my review
> of her past medical records, it is my professional opinion that
> [Miller's] complaints of pain dating back to May 15, 1999 are
> consistent with having severe degenerative osteoarthritis in
> both hips.
> . . . .

> . . . Therefore, it is within a reasonable degree of medical
> certainty that the limitations in [Miller's] ability to walk and
> stand were present by May 15, 1999.

(Id.).

3.    ALJ's Findings

After hearing Miller's testimony at the remand hearing and reviewing the

medical evidence, the ALJ found that Miller had not engaged in any substantial gainful

activity at any time relevant to his decision and had the "severe impairment" of

osteoarthritis since the onset date she alleged.  (Id. at 220).  He further concluded that this

impairment met or medically equaled one of the listed impairments in 20 C.F.R. § 404,

Appendix 1, Subpart P.  (Id.).  The ALJ nevertheless found that prior to August 29, 2001,

Miller "had the residual functional capacity to perform sedentary work, which consists of

the ability to lift and carry ten pounds, sit for six hours, and stand and walk for two hours

in an eight-hour workday."  (Id.).

In reaching this conclusion, the ALJ heavily relied upon Dr. Antoine's

report.  (Id. at 220-21).  He also did "not credit [Miller's] current treating physician [Dr.

Niewold], who . . . provided a retrospective opinion that [Miller's] limitations date back

to 1999."  (Id. at 221).  The ALJ chose not to credit Dr. Niewold's opinion because it was

contradicted by (i) Dr. Antoine's report indicating that Miller had a capacity for sedentary

work, and (ii) clinical notes from August 2001 which revealed that Miller complained of

pain "over the last three months" and "off and on pain since 1995."  (Id.).

As the basis for his finding that Miller lacked the functional capacity to

perform sedentary work after August 29, 2001, the ALJ cited Dr. Nevins' findings, the

reports of Miller's visits to Jacobi in September and October 2001, and the records from

HSS.  (Id.).  The ALJ held that Miller should receive retroactive benefits beginning

August 29, 2001.  (Id. at 223).

III.    Applicable Law

    A.    Disability Determination

        "Disability" is defined in the Act as an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  In making a determination as to a claimant's disability, the

Commissioner is required to apply the familiar five-step sequential process set forth in 20

C.F.R. §§ 404.1520 and 416.920.  The Second Circuit has described that process as

follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the claimant
> suffers such an impairment, the third inquiry is whether, based
> solely on medical evidence, the claimant has an impairment
> which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will
> consider him disabled without considering vocational factors

13

such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of this process. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the Commissioner finds that a claimant is disabled or not disabled at an early step in the process, she is not required to proceed with any further analysis. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work. DeChirico, 134 F.3d at 1180.

B.     Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if it establishes that no material facts are in dispute and that it is entitled to judgment as a matter of law. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Caraballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g); see Richardson v. Perales, 402 U.S. 389, 401 (1971); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).

A reviewing court is not permitted to review the Commissioner's decision de novo.  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).  Rather, where the Commissioner's determination is supported by substantial evidence and contains no legal error, the decision must be upheld.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Ortiz v. Barnhart, No. 00 Civ. 9171 (RWS), 2002 WL 449858, at *4 (S.D.N.Y. Mar. 22, 2002).

IV.   Discussion

The sole issue before the Court is the correctness of the ALJ's determination that Miller first became disabled on August 29, 2001.  Both parties agree that the ALJ committed an error of law in the analysis he used to determine the proper

onset date. (Pl.'s Mem. at 7-11; Def.'s Mem. at 1, 13, 15). However, the Commissioner requests that the Court remand the case for further administrative proceedings so that the ALJ may correct these errors. Miller seeks a remand solely for the calculation and payment of benefits, based on a disability onset date of May 15, 1999. For the reasons set forth below, I agree with the Commissioner that a remand for further proceedings is necessary.

A.     Legal Errors

The ALJ committed two legal errors that preclude this Court from upholding his decision. First, the ALJ failed to follow the proper methodology in rejecting the opinion of Dr. Niewold, Miller's treating physician. Second, the ALJ failed to comply with an SSA ruling requiring him to appoint a medical advisor to help him with the process of inferring an appropriate disability onset date from the record as a whole.

1.     Opinion of Treating Physician

Pursuant to SSA regulations, an ALJ is required to give controlling weight to a treating physician's opinion "when the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'"  Colondres v. Barnhart, No. 04 Civ. 1841 (SAS), 2005 WL 106893, at *6 (S.D.N.Y. Jan. 18, 2005) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The regulations further mandate that if controlling weight is not given to the claimant's treating physician's opinion, the ALJ must consider

16

a series of factors in determining the proper weight to give to that opinion. Id. at *6.

Those factors include "(i) the frequency of examination and the length, nature, and extent

of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's

consistency with the record as a whole; and (iv) whether the opinion is from a specialist."

Shaw, 221 F.3d at 134; see 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). The ALJ

is further required to explain and provide "good reasons" for the failure to credit the

treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("We will

always give good reasons in our notice of determination or decision for the weight we

give your treating source's opinion."). If the ALJ fails to apply the correct standard in

weighing a treating physician's opinion or fails to give good reasons for rejecting the

opinion, a remand for further fact finding is the appropriate remedy. Halloran v.

Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); Dudelson v. Barnhart, No. 03 Civ. 7734

(RCC)(FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d

at 504).

It also is "well-settled that the 'treating physician rule' applies to

retrospective diagnoses, those relating to some prior time period during which the

diagnosing physician may or may not have been a treating source, as well as to

contemporaneous ones." Martinez v. Massanari, 242 F. Supp. 2d 372, 377 (S.D.N.Y.

2003) (citing Shaw, 221 F.3d at 133; Perez, 77 F.3d at 48; and Wagner v. Sec'y of Health

& Human Servs., 906 F.2d 856, 861-62 (2d Cir. 1990)). A retrospective diagnosis "must

be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment prior to" the relevant time. Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (internal quotation marks omitted).

Additionally, the "ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel." Perez, 77 F.3d at 47 (internal citation omitted). Thus, when the information received by the SSA is inadequate to determine if the claimant is disabled, the SSA must attempt to recontact the claimant's medical sources and, if necessary, arrange for consultive examinations with other medical sources, for clarification or supplementation. See 20 C.F.R. §§ 404.1512(e)(1), 404.1512(f). The regulations provide that the SSA "will seek" the additional evidence "when the report from [the] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e)(1).

In his remand decision, the ALJ did not credit treating physician Niewold's opinion that the onset date of Miller's disability was May 15, 1999. (R. 221). In making this determination, however, the ALJ cited only two items of evidence contradicting Dr. Niewold's opinion: (i) Dr. Antoine's report and (ii) clinical notes from Jacobi during August 2001 indicating that Miller had complained of pain "over the last three months"

and "off and on pain since 1995." (Id.). No further rationale was provided by the ALJ for rejecting the medical findings of the treating physician.

As the ALJ correctly noted, there is evidence in the record that contradicts Dr. Niewold's conclusion regarding Miller's disability onset date. However, despite this evidence, the ALJ failed to follow the administrative methodology mandated by the SSA regulations in rejecting Dr. Niewold's opinion. Because the ALJ did not give the treating physician's opinion controlling weight, he was required both to provide "good reasons" for his decision and to apply the factors set forth in the regulations to determine the proper weight to give the opinion. It is clear that the ALJ failed to do so. For example, he did not discuss how frequently Dr. Niewold examined Miller, the extent of the doctor's treatment relationship with her, or whether other evidence in the record supported Dr. Niewold's opinion. This failure to apply the factors set forth in the regulations constitutes legal error.[12] See, e.g., Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984) (case remanded because ALJ failed to consider treating physician's opinion as to claimant's ability to sit for more than one or two hours at a time).

It also appears that the ALJ should have supplemented the administrative record by recontacting Dr. Niewold. See 20 C.F.R. § 404.1512(e)(1) (requiring SSA to "seek additional evidence" from a treating physician whose report "does not contain all

---

[12]    Because the ALJ did not consider the factors required by the regulations, it is not necessary to decide whether the analysis that he did proffer constitutes "good reasons" for the rejection of May 15, 1999, as Miller's disability onset date.

the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques"). On remand, the ALJ "may do this by requesting . . . a more detailed report" from Dr. Niewold. Id.; see McCary v. Barnhart, No. 02-CV-6622 (FB), 2003 WL 22709121, at *4 (E.D.N.Y. Nov. 13, 2003) ("given the cursory nature" of a physician's previous opinion, "the ALJ [on remand] should inquire if th[e] treating physician can submit a more developed opinion"). Such a report will assist the ALJ in determining the proper weight to give Dr. Niewold's opinion because the ALJ is required to consider the extent to which the opinion is supported by relevant evidence, including medical and laboratory findings, and the quality of the explanation provided for an opinion. See 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). It currently is unclear which specific medical records Dr. Niewold considered in forming his opinion since he states only that he considered unspecified "past medical records" and charts of her "past treatments." (R. 427). This generic citation falls far short of the mark. A new, more detailed report from Dr. Niewold consequently should outline the specific relevant medical evidence he considered and exactly how that evidence supports his conclusion. With this supplementation, the ALJ will be able to determine properly whether Dr. Niewold's opinion that May 15, 1999, is Miller's correct disability onset date is entitled to controlling weight.

Miller contends that there is no need to recontact Dr. Niewold because his report was "sufficiently complete for the ALJ to credit it." (Pl.'s Mem. at 14). In

particular, she argues that the doctor's assessment was based on her "current sym[p]tomology," and therefore "reflects a medically accepted clinical diagnostic technique." (Pl.'s Reply Mem. at 2 (citing Kraemer v. Apfel, No. 97 Civ. 8638 (AGS), 1999 WL 14684, at *4 (S.D.N.Y. Jan. 14, 1999))).[13] However, even if Dr. Niewold's opinion is "based on medically acceptable clinical and laboratory diagnostic techniques," an ALJ must recontact a medical source when his opinion "does not contain all necessary information." 20 C.F.R. § 404.1512(e)(1). Here, the current report fails to contain such necessary information as a detailed description of the exact medical records relied upon by Dr. Niewold and an explanation of how those records informed his opinion. Accordingly, a remand is necessary.

On remand, if the ALJ decides not accord Dr. Niewold's opinion controlling weight after recontacting him, he should take care to detail his reasons therefor.

### 2.    Necessity of a Medical Advisor

Miller has no medical records for the time period between 1996 and 2001. There consequently are no contemporaneous records which can establish that she was disabled as of May 15, 1999. The absence of these records, however, does not preclude her from otherwise demonstrating the she was disabled as of that date. Social Security Ruling ("SSR") 83-20 provides instructions for the determination of disability onset date

---

[13]    The page numbered "2" is actually page 3 of Miller's reply brief.

in such circumstances when the date needs to be inferred.  See SSR 83-20, 1983 WL

31249 (1983); see also Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984) (Social Security

Rulings are binding on all SSA decision-makers).

Under SSR 83-20, to determine an appropriate onset date in a case that

involves a disability without a sudden or traumatic origin, the ALJ should consider "the

applicant's allegations, work history, if any, and the medical and other evidence

concerning impairment severity."  SSR 83-20, 1983 WL 31249, at *2.  "The starting point

in determining the date of onset of disability is the individual's statement as to when

disability began."  Id.  That date should be used if it is consistent with all the evidence

available.  Id. at *3.  In addition, "[t]he day the impairment caused the individual to stop

work is frequently of great significance."  Id. at *2.  Although SSR 83-20 recognizes that

"medical evidence serves as the primary element in the onset determination," it also

acknowledges that "[w]ith slowly progressive impairments, it is sometimes impossible to

obtain medical evidence establishing the precise date an impairment became disabling."

Id.  In such circumstances, it is "necessary to infer the onset date from the medical and

other evidence that describe the history and symptomatology of the disease process."  Id.

Any onset date inference, however, must have a "legitimate medical basis."

Id. at *3.  Therefore, SSR 83-20 provides that, at "the hearing, the [ALJ] should call on

the services of a medical advisor when onset must be inferred."  Id.; accord Martinez v.

Barnhart, 262 F. Supp. 2d 40, 47 (W.D.N.Y. 2003) (ALJ erred in not calling medical

advisor to infer onset date of disability in the absence of contemporaneous medical records) (citing Walton v. Halter, 243 F.3d 703 (3d Cir. 2001)).  Because the ALJ failed to call a medical advisor to help infer an onset date in this case, he committed legal error.  See Dhanraj v. Barnhart, No. 04 Civ. 5537 (MBM), 2006 WL 1148105, at *6 (S.D.N.Y. May 1, 2006) (remanding, in part, because ALJ failed to hire a "medical advisor to assist him" in determining the disability onset date as required by SSR 83-20).[14]

B.    Proper Relief

As noted earlier, notwithstanding the conceded flaws in the ALJ's decision, Miller contends that the Court should remand solely for the purpose of calculating benefits based upon an onset date of May 15, 1999.  Pursuant to the fourth sentence of 42 U.S.C. § 405(g), a district court reviewing the Commissioner's final decision has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for rehearing."  A remand solely for the calculation of benefits is an extraordinary remedy warranted only when the record contains persuasive proof of the disability onset date and a rehearing would serve no purpose.  See Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) (citing Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998)); Rivera v. Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) (citing Rosa, 168 F.3d at

_____

[14]    A medical advisor would be particularly useful in this case because Miller failed to seek treatment between 1996 and 2001, and there consequently are no contemporaneous medical records supporting her alleged May 15, 1999, onset date.  Additionally, Dr. Niewold failed to provide a detailed explanation as to why that date was the appropriate date.

23

83); Martinez, 262 F. Supp. 2d at 49 (citing Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)).

Here, the evidence is not so conclusive as to permit a remand merely to calculate benefits. For example, in his report of his examination on February 24, 2001, Dr. Antoine concluded that Miller would have difficulty standing for long periods of time, walking long distances, or lifting heavy objects. (R. 125). Therefore, by implication, Dr. Antoine found that she could perform sedentary work, which can entail sitting for six hours during an eight-hour work day and lifting no more than ten pounds at a time. Rosa, 168 F.3d at 78 n.3; 20 C.F.R. § 404.1567(a). Indeed, Miller evidently told Dr. Antoine on that date that she could sit for up to one hour, stand for up to fifteen minutes, and lift up to ten to fifteen pounds. (R. 124). If the ALJ credits these findings, he reasonably could conclude that May 15, 1999, is not an appropriate onset date.

This is not the only evidence in the record that potentially conflicts with Dr. Niewold's findings. First, Dr. Taverni's employability report, which was prepared some time after August 29, 2001, concluded that Miller could perform "desk duty" or work on "telephones" despite her osteoarthritis.[15] (R. 200). Second, Miller made various comments to doctors at Jacobi in 2001 suggesting that her pain was intermittent and had worsened only in the three-month period prior to August 2001. (See id. 163). Finally,

---

[15] Although this report may be entitled to little weight because it is undated and Dr. Taverni may simply have based his opinion on a review of Miller's medical records, it is for the ALJ, not the Court, to weigh the conflicting evidence. Schaal, 134 F.3d at 504.

although it is not determinative, the fact that Miller did not seek treatment for her hip at any time between 1996 and 2001 can at least be considered by the ALJ in deciding whether she was suffering from a disability at that time.  20 C.F.R. § 416.929(c)(3)(v); see Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989) (failure to seek treatment "seriously undermines" contention that claimant was disabled).  But see, e.g., Shaw, 221 F.3d at 133 (fact of time lapse in seeking treatment does not preclude finding of disability, particularly where plaintiff "could not afford medical care").

Nevertheless, there clearly is substantial evidence in the record to support the ALJ's finding that Miller was disabled as of at least August 29, 2001.  In fact, the Commissioner concedes that Miller was disabled by that date.  (See Def.'s Mem. at 1 ("substantial evidence supports the partially favorable decision"); Def.'s Reply Mem. at 10 (requesting that "decision that plaintiff was not disabled prior to August 29, 2001, be reversed" and remanded) (emphasis added)).  For these reasons, although the case must be remanded to the Commissioner for a further hearing, not simply for the calculation of benefits, the issue on rehearing should be limited to whether Miller is entitled to benefits based on any disability onset date between May 15, 1999, and August 29, 2001.  Additionally, to the extent that Miller has not yet received retroactive benefits as of August 29, 2001, the SSA should be directed to calculate and pay those benefits to her.

V.     Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings should be granted insofar as it seeks a remand for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g), and Miller's cross-motion should be denied.  On remand, the ALJ should conduct a hearing to determine, in the manner described above, whether Miller is entitled to a disability onset date between May 15, 1999, and the August 29, 2001 onset date that the Commissioner previously found.  Additionally, to the extent that Miller has not yet received them, the Commissioner should be directed to calculate and pay any benefits due based on an August 29, 2001 onset date.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Loretta A. Preska and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Preska.  The failure to

file timely objections will result in a waiver of those objections for purposes of appeal.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140

(1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).


Dated:     New York, New York
           March 17, 2008


                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge



Copies to:

Toby Golick, Esq.
Cardozo Bet Tzedek Legal Services
55 Fifth Avenue, 11th Floor
New York, New York 10003

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007